IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LARRY WALD,<br>   Plaintiff,<br><br>v.<br><br>1 FINANCIAL MARKETPLACE SECURITIES, LLC,<br>and KEVIN M. ROSS,<br>   Defendants. | CIVIL ACTION<br><br>NO. 2:09-cv-1116-WY |

**<u>Memorandum</u>**

YOHN, J.                                                                                                                   October 5, 2009

      Plaintiff, Larry Wald, brings the instant dispute against 1 Financial Marketplace Securities, LLC ("1 Financial Securities"), and its Chief Executive Officer, Kevin M. Ross. Defendants move to compel arbitration and to stay the proceedings in this court pending the completion of the arbitration. For the reasons discussed below, I will grant defendants' motion.

**I.    Factual And Procedural Background**

      Wald raises a variety of claims related to the loss of his investment in a hedge fund named Securion I, L.P. ("Securion"), a fund that Ross, Wald's investment advisor, recommended to him. In support of their motion, defendants cite an arbitration clause in a Client Account Record Form and Customer Agreement that Wald signed, requiring that the Financial Industry Regulatory Authority ("FINRA") arbitrate all disputes between Wald and 1 Financial Securities "arising out of or relating to" 1 Financial Securities' "business" or "this agreement." (Defendants' Memorandum of Law in Support of Motion ("Defs.' Mem.") Ex. A.) Wald and defendants disagree about whether this arbitration clause applies to the instant dispute.

Wald describes his business relationship with defendants as long-standing. According to his complaint, he and Ross first established their business relationship in 1990. (Compl. ¶¶ 13-14.) Wald states that, since then, he has relied on the advice of Ross for investment of his pension and Individual Retirement Account ("IRA"). (Id. at ¶ 14.) Wald states that (1) Ross was the Chief Compliance Officer and Chief Executive Officer of 1 Financial Securities, (2) Ross was a registered representative of 1 Financial Securities, (3) Ross controlled 1 Financial Securities, and (4) 1 Financial Securities acted through Ross as its agent. (Id. at ¶¶ 6-8, 43, 45, 47, 49, 51, 54-56, and 61-63.) Wald states that 1 Financial Securities was a broker-dealer registered with the United States Securities and Exchange Commission and the Pennsylvania Securities Commission "to conduct the following business: mutual fund retailer; and broker or dealer selling variable life insurance or annuities." (Id. at ¶¶ 3-4.)

Wald describes his business relationship with defendants as encompassing a broad range of activities. Wald states that defendants are his "financial and investment advisors" and "registered representatives." (Id. at ¶¶ 67, 70, and 93.) He states that 1 Financial Securities and Ross "entered into a contract with Plaintiff Wald to provide investment services that were in Plaintiff Wald's best interests." (Id. at ¶ 98.) Wald does not provide additional details about the formation of this contract or its terms or whether it differs from the Client Account Record Form and Customer Agreement.

Defendants attached the Client Account Record Form and Customer Agreement as an exhibit to their motion. (Defs.' Mem. Ex. A.) Wald signed the Client Account Record Form on May 22, 2002, in the block requiring his signature.[1] (Id.; Plaintiff's Answer to Defendants'

---

[1] The document does not include signature blocks for either 1 Financial Securities or Ross. (Id.)

Motion ("Pl.'s Ans.") ¶ 22.) Through the Client Account Record Form, Wald registered an IRA account with 1 Financial Securities. (Defs.' Mem. Ex. A.) He also acknowledged that he had read, understood, and agreed to the terms set forth in the Customer Agreement on the reverse side of the Client Account Record Form. (Id.) The Client Account Record Form specifically reflects Wald's understanding that the Customer Agreement contains an arbitration clause:

> **This Agreement contains a pre-dispute arbitration clause in paragraph 9 on the reverse side of this page. I/we acknowledge receiving a copy of this Agreement.**

(Id.) (Emphasis in original.) The arbitration clause in the Customer Agreement states as follows:

> **Any controversy arising out of or relating to your business or this agreement shall be subject to arbitration. This agreement and its enforcement shall be governed by the laws of the State of Pennsylvania. Arbitration shall be conducted under the provisions of the Code of Arbitration Procedures of the National Association of Securities Dealers.[2] Arbitration must be commenced by service upon the other party of a written demand for arbitration or a written notice of an intention to arbitrate.**

(Id.) (Emphasis in original.)[3] The Customer Agreement also requires that Wald not "place any order to purchase securities unless I have received and read a copy of the prospectus, private placement memorandum (PPM) or offering circular (OC) for the security being purchased (except for brokerage account transactions for which no prospectus, PPM or OC is required), and I understand that any investments that I make will be on and subject to the terms and conditions set forth in the prospectus, PPM or OC." (Id.)[4]

---

[2] The National Association of Securities Dealers (the "NASD") changed its name to FINRA in July 2007. (Plaintiff's Memorandum of Law Contra Defendants' Motion ("Pl.'s Mem.") 6 n.2.)

[3] The Customer Agreement defines the term "you" as 1 Financial Securities. (Id.)

[4] The Customer Agreement defines the terms "I, me and my" as Wald. (Id.)

- 3 -

The controversy in this lawsuit arises out of Wald's investment in Securion. Wald alleges that Ross established Securion in early 2007. (Id. at ¶ 15.) Wald claims that Ross is the Chief Executive Officer of the general partner of Securion – 1 Financial Marketplace, LLC ("1 Financial Markeptlace") – and that Ross controls 1 Financial Marketplace, as he does defendant 1 Financial Securities.[5] (Pl.'s Ans. ¶¶ 7-9; Compl. ¶ 6, 8.) Wald alleges that from early 2007 through February 2008, Ross solicited him to invest a total of $350,000 in Securion. (Compl. ¶ 19.)[6] Wald claims that Ross informed him in mid-December 2008 that the entire $350,000 investment in Securion had been lost. (Id. at ¶ 20.) Defendants claim that New York investment advisor Bernard Madoff misappropriated the majority of Securion's assets. (Defs.' Mem. 3.)

Wald claims that he is an unsophisticated investor who has never invested in a hedge fund and who invested in Securion only in reliance upon the repeated assurances of Ross that Securion was a suitable, safe investment for him. (Compl. ¶¶ 18, 24, 26, 28, 30, 32, 34, and 36.)[7] Wald claims that Ross's assurances were misstatements "made negligently or knowingly with the intent to deceive Plaintiff Wald." (Id. at ¶¶ 27, 29, 31, 33, 35, and 37.) He claims that 1 Financial Securities, "acting through Defendant Ross," knew or should have known that Wald was not a sufficiently sophisticated investor for Securion to be an appropriate investment for him. (Id. at ¶¶ 43, 45, 47, 49, and 51.)

---

[5] In an "ERISA Disclosure Statement," the Customer Agreement discloses that 1 Financial Marketplace, along with 1 Financial Securities and 1 Financial Marketplace Holding Company, LLC, may be involved in a customer's investments. (Defs.' Mem. Ex. A.)

[6] Wald has not sued 1 Financial Marketplace here. He does, however, allege that he has initiated an arbitration proceeding against 1 Financial Marketplace and Ross. (Pl.'s Ans. ¶ 27.)

[7] On the Client Account Record Form, Wald listed his risk tolerance as "moderate," his investment experience as "moderate," and his investment objective as "growth." (Defs.' Mem. Ex. A.)

Wald filed the current action against defendants on March 13, 2009.  Wald's complaint contains eight counts:

(1)	Count I alleges that Ross, and 1 Financial Securities "acting by and through Defendant Ross," violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 of the Securities Exchange Commission, 17 C.F.R. § 240.10b-5.  (Compl. ¶¶ 53-59.)

(2)	Count II alleges that Ross, and 1 Financial Securities "acting by and through Defendant Ross," violated the Pennsylvania Securities Law, 70 Pa.C.S. §§ 1-301(c), 501(a)(ii), and 503.  (Id. at ¶¶ 60-65.)

(3)	Count III alleges that defendants, as Wald's "financial and investment advisors," breached their fiduciary duties of good faith and loyalty by inducing Wald to invest in Securion.  (Id. at ¶¶ 66-78.)

(4)	Count IV alleges that, in the event that one of defendants did not owe Wald a fiduciary duty, each is nevertheless liable for knowingly aiding and abetting in the other's breaches of fiduciary duties.  (Id. at ¶¶ 79-84.)

(5)	Count V alleges that defendants committed fraud.  (Id. at ¶¶ 85-91.)  Among other things, Wald claims that defendants "intentionally, or with reckless indifference to the truth, misrepresented the nature of the Securion I, L.P. investment when they prepared and delivered to Plaintiff Wald the Offering Memorandum."  (Id. at ¶ 87.)

(6)	Count VI alleges negligence.  (Id. at ¶¶ 92-96.)  Wald claims that, as his "financial and investment advisors and registered representatives," defendants had a duty to

        act with reasonable care, skill, and diligence, and that Wald suffered damages as a direct result of defendants' breaches of that duty.  (Id.)

(7)     Count VII alleges that defendants' breached their contract with Wald "to provide investment services that were in Plaintiff Wald's best interests" by failing to recommend a suitable, safe investment and by failing to conduct due diligence with regard to the investment.  (Id. at ¶¶ 97-100.)

(8)     Count VIII, alleges that defendants violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa.C.S. § 201, et seq., by deceiving Wald concerning the quality and characteristics of Securion.  (Id. at ¶¶ 101-109.)

In addition, Wald alleges that defendants were never licensed to sell investments in Securion.  (Pl.'s Ans. ¶¶ 2, 5.)  He alleges that FINRA licensed Ross only to sell "investment company products and variable contracts."  (Id. at ¶¶ 13-14.)  He alleges that FINRA licensed 1 Financial Securities "to conduct only two businesses:  mutual funds and life insurance and annuities."  (Id. at ¶ 15.)  He states that his investment in Securion was not, in fact, held in his account with 1 Financial Securities.  (Id. at ¶ 3.)  He states that only 1 Financial Marketplace, the general partner of Securion, had the authority to receive a management fee from Wald's investment in Securion, not either of defendants.  (Id. at ¶ 6.)

        Defendants filed the pending motion on May 20, 2009.  The parties' central disagreement for purposes of the motion is whether Wald is required to arbitrate his claims through FINRA.

## II.    Standard Of Review

        Defendants rely upon the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, et seq., as the basis for their motion.  They argue that "[u]nder the FAA, if a court determines that a valid arbitration agreement exists and the claims fall within the scope of the agreement, the court must

submit the matter to arbitration and stay the proceedings until the arbitration has concluded." (Defs.' Mem. 5.)

The FAA "provides two parallel devices for enforcing an arbitration agreement: a stay of litigation in any case raising a dispute referable to arbitration, 9 U.S.C. § 3, and an affirmative order to engage in arbitration, § 4." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 23 (1983).[8] The threshold question of whether a dispute is arbitrable is a matter properly decided by this court. AT&T Techs., Inc. v. Commc'n Workers of Am., 475 U.S. 643, 649 (1986). When confronted with a motion to compel arbitration and to stay proceedings pursuant to 9 U.S.C. §§ 3 and 4, the appropriate standard of review for the district court is that employed in evaluating motions for summary judgment under Fed. R. Civ. P. 56(c). Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., 636 F.2d 51, 54 n. 9 (3d Cir. 1980). Accordingly, the court's task is limited to determining whether there is a genuine, material factual question as to the applicability of the arbitration agreement to plaintiff's claims; if such a disputed factual question does exist,

---

[8] 9 U.S.C. § 3 states as follows:

If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 4 states as follows:

A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner prescribed for in such agreement.

the court will not resolve it at this time. See generally Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). If, however, the arbitration clause clearly applies to the instant dispute, then defendants will be entitled to arbitration and the stay that they seek. Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213, 218 (1985) ("By its terms, the [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.") (emphasis in original).

The Third Circuit has set forth a two-prong inquiry for determining whether to compel arbitration under the FAA and to stay federal proceedings.[9] Under this two-prong test, the issues are: "(1) Did the parties seeking or resisting arbitration enter into a valid arbitration agreement?

---

[9] The FAA applies to any "written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof . . . ." 9 U.S.C. § 2 (1994). The FAA applies to the arbitration clause because the Customer Agreement involves the purchase and sale of securities, which is significantly more than the "slightest nexus" with commerce that the FAA requires. B.G. Balmer & Co., Inc. v. U.S. Fidelity & Guar. Co., No. 98-734, 1998 WL 764669, at *3 (E.D.Pa. Oct. 30, 1998); see also Zink v. Merrill Lynch, 13 F.3d 330, 333 (10th Cir. 1993) (agreements involving trade in securities "patently *do* involve 'commerce' as defined under the Act") (emphasis in original).

When an arbitration clause is subject to the FAA, questions concerning the interpretation of the clause should be determined by reference to federal substantive law. Harris v. Green Tree Financial Corp., 183 F.3d 173, 179 (3d Cir. 1999). Federal law would apply in construing and enforcing the arbitration clause, even in those cases in which jurisdiction is based on diversity, such as the instant dispute. Goodwin v. Elkins & Co., 730 F.2d 99, 108 (3d Cir. 1984). Nevertheless, in interpreting an arbitration agreement, a court may look to state law for "generally applicable contract defenses." Harris, 183 F.3d at 179. Furthermore, the relevant state's law of contracts guides the determination of whether the parties entered a valid agreement to arbitrate. Blair v. Scott Specialty Gases, 283 F.3d 595, 603 (3d Cir. 2002).

Regardless, the parties agree (Pl.'s Mem., 4; Defs.' Mem., 4 n.4) that there is no meaningful difference between federal and Pennsylvania substantive law with respect to the scope of the arbitration agreement in the instant dispute. State Farm Mut. Auto. Ins. Co. v. Coviello, 233 F.3d 710, 713 n.1 (3d Cir. 2000).

[and] (2) Does the dispute between those parties fall within the language of the arbitration agreement?" John Hancock Mut. Life Ins. Co. v. Olick, 151 F.3d 132, 137 (3d Cir. 1998) (citing In re Prudential Ins. Co. of Am. Sales Practice Litig., 133 F.3d 225, 233 (3d Cir. 1998)); see also Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc., 247 F.3d 44, 54-55 (3d Cir. 2001) ("[A] court asked to stay proceedings pending arbitration must determine whether there is a valid agreement to arbitrate and, if so, whether the specific dispute falls within the substantive scope of that agreement.") (citations omitted).

The Third Circuit has articulated a "strong presumption in favor of arbitration," holding that "doubts 'concerning the scope of arbitrable issues should be resolved in favor of arbitration.'" Great Western Mortg. Corp. v. Peacock, 110 F.3d 222, 228 (3d Cir. 1997) (quoting Moses H. Cone, 460 U.S. at 24).[10] "An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." AT&T Techs., 475 U.S. at 650; see also Battaglia v. McKendry, 233 F.3d 720, 727 (3d Cir. 2000). This presumption in favor of arbitrability is particularly applicable where the arbitration clause is broad. AT&T Techs., 475 U.S. at 650. It should be emphasized as to the instant dispute, however, that arbitrability is a matter of contract and that "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." Id. at 648 (citations omitted).

"To determine whether a claim falls within the scope of an arbitration agreement, the focus is on the factual underpinnings of the claim rather than the legal theory alleged in the complaint." Medtronic, 247 F.3d at 55 (citations omitted). In addition, due to the "federal policy

---

[10] The presumption in favor of arbitration, however, "does not apply to the determination of whether there is a valid agreement to arbitrate between the parties." Kerleis v. Dickie, McCamey & Chilcote, P.C., 560 F.3d 156, 160 (3d Cir. 2009) (citation omitted).

in favor of arbitration," courts need only engage in a "limited review" to ensure that a dispute is arbitrable. John Hancock, 151 F.3d at 137 (citations omitted). Courts are not to decide the merits of the dispute. AT&T Tech., Inc., 475 U.S. at 649-50. My inquiry is therefore limited to consideration of the narrow issue of arbitrability. Nothing in this memorandum should be construed as consideration of the substance of Wald's claims.

**III.    Discussion**

    **A.    A Valid Arbitration Agreement Exists**

Wald argues that the Client Account Record Form and Customer Agreement containing the arbitration clause at issue here is not a valid contract because it does not contain signatures for either 1 Financial Securities or Ross. (Plaintiff's Surreply ("Pl.'s Sur.") 2-3.)[11] Wald appears to be claiming that defendants therefore do not have standing to enforce the arbitration clause contained in the Customer Agreement.[12]

"As a general rule, signatures are not required for a binding contract unless such signing is expressly required by law or by the intent of the parties." Shovel Transfer & Storage, Inc., v. Pa. Liquor Control Bd., 739 A.2d 133, 136 (Pa. 1999); see also American Eagle Outfitters v. Lyle & Scott Ltd., --- F.3d ----, 2009 WL 2902250 (3d Cir. Sept. 11, 2009) ("Signatures are not dispositive evidence of contractual intent."). Wald does not argue or produce evidence that a statute required an authorized signature on behalf of 1 Financial Securities on the Client Account Record Form and Customer Agreement to render the document an enforceable contract. In

---

[11] Wald does not contest the authenticity of the document.

[12] Wald also states in his surreply that defendants, who cite only to the Client Account Record Form and Customer Agreement as evidence of a contractual relationship between the parties, "overlook the fact that a contractual relationship can be established by an oral contract." (Pl.'s Sur., 2.) Wald does not, however, provide any evidence of any oral contract or argue that any oral contract actually applies to the instant dispute.

- 10 -

addition, Wald offers no evidence that the parties intended to require a signature on behalf of 1 Financial Securities in order for the document to be binding. To the contrary, the document signals prominently and throughout that 1 Financial Securities is a party, including by specifically defining 1 Financial Securities as "you." (Defs.' Mem. Ex. A.) The document also states that Wald's assent to be bound by its terms is in "consideration" of 1 Financial Securities accepting his account. (Id.) There is a signature block for Wald on the Client Account Record Form but no signature block for 1 Financial Securities. (Id.) In these circumstances, the lack of a signature block for 1 Financial Securities evidences not that the agreement is unenforceable, but instead that the parties did not intend to require a signature on behalf of 1 Financial Securities in order to consummate the contract. Even viewing the facts in the light most favorable to Wald, reasonable people could not disagree that the Client Account Record Form and Customer Agreement was intended to bind 1 Financial Securities. Accordingly, I find that 1 Financial Securities is bound by the arbitration clause and may enforce its terms.

I also find, based on Wald's allegations that Ross acted as an agent of 1 Financial Securities, that Ross too is bound by the arbitration clause. It is well-settled that "[t]raditional principles of agency law may bind a non-signatory to an arbitration agreement." E.I. Dupont De Nemours & Co. v. Phone Poulenc Fiber & Resin Intermediates, S.A.A., 269 F.3d 187, 198 (3d Cir. 2001). In Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 7 F.3d 1110, 1121 (3d Cir. 1993), the Third Circuit found that where a principal is bound to arbitration and the complaints arise out of the agent's conduct on behalf of that principal, the agent is bound by the principal's agreement to arbitrate disputes. In the instant dispute, Wald's allegations establish that there is a clear and close nexus between Ross and 1 Financial Securities and that Wald's claims arise in

large part out of Ross's alleged conduct. Ross is therefore entitled to enforce the arbitration clause to the same extent as his principal, 1 Financial Securities.

In support of his argument, Wald cites McNulty v. H&R Block, Inc., 2004 Pa.Super. 45, 843 A.2d 1267 (Pa. Super. 2004). In that case, the Pennsylvania Superior Court held that H&R Block could not enforce an arbitration clause in part because the contract containing the clause did not require a signature from H&R Block. Unlike 1 Financial Securities, however, H&R Block was not a party to the contract at issue. The court found that "[a]t most, Block is a third-party beneficiary solely to the arbitration clause of [the contract]." Id. at 1272. The court relied on the lack of a requirement of H&R Block's signature as one piece of evidence that H&R Block did not have any "direct connection" to the arbitration clause and concluded that "[i]t simply makes no sense to provide Block with independent rights to enforce the arbitration provision of a contract it is not a party to, concerning an issue not covered by the contract." Id. Here, as explained above, it is clear that both defendants have a "direct connection" to the Client Account Record Form and Customer Agreement and the arbitration clause contained therein.

Wald also cites, Jairett v. First Montauk Securities, 153 F.Supp.2d 562 (E.D.Pa. 2001), but Jairett is similarly inapposite. To begin with, the court in Jairett, confronted with a motion to dismiss, declined to rule on the arbitrability of the dispute because the purported arbitration agreements were not a part of the pleadings. Id. at 575. Regardless, the court stated, in dicta, that the reason the purported arbitration agreements would be inapplicable was because they were not between the parties to the dispute but instead between the plaintiffs and another entity. Id. Here, the Customer Agreement is between all the parties to the instant dispute.

Accordingly, I find that the Client Account Record Form and Customer Agreement is a valid contract that binds both defendants, who therefore are entitled to enforce the arbitration clause contained therein.

### B. The Instant Dispute Falls Within The Scope Of The Arbitration Clause

The remaining question is whether this dispute falls within the scope of the arbitration clause contained in the Customer Agreement. By its terms, the arbitration clause applies to the instant dispute if Wald's claims arise out of, or are related to, 1 Financial Securities' "business" or the "agreement" itself. I find that they are.

#### 1. Wald's Claims Arise Out Of And Are Related To 1 Financial Securities' Business

Wald argues that the arbitration clause does not apply to the instant dispute because 1 Financial Securities' "business" did not involve the marketing to Wald of hedge fund securities like Securion. In support of this argument, Wald asserts that (1) he only registered an IRA account with 1 Financial Securities, not an account that would involve investment in a hedge fund; (2) FINRA did not license 1 Financial Securities or Ross to market hedge funds; and (3) 1 Financial Securities and Ross did not gain any direct benefit from Wald's investment in Securion because only the general partner of Securion, 1 Financial Marketplace, had authority to receive management fees.

Wald's argument that the Customer Agreement contemplates 1 Financial Securities' "business" to be limited to Wald's IRA account contrasts with the explicit terms of the Customer Agreement. The Customer Agreement contemplates that defendants might buy or sell on Wald's behalf a broad range of "securities," without any apparent limit on the types of such securities. (Defs.' Mem. Ex. A.) In fact, such securities expressly include securities offered through a "private placement memorandum" such as the one defendants prepared and provided to Wald

- 13 -

regarding Securion. (Defs.' Mem. Ex. A; Compl. ¶¶ 16-17, 87.) Wald's investment in Securion appears to be squarely within the broad business relationship contemplated by the Customer Agreement.

Wald also argues that, because his IRA account never contained the Securion investment, the investment was never a part of 1 Financial Securities' "business." The Customer Agreement does not, however, contain any language that confines 1 Financial Securities' "business" to the IRA. Rather, the Customer Agreement appears to contemplate a broad range of investment activity.

Indeed, the Third Circuit has interpreted an arbitration clause that used similar language as applying broadly to the "business relationship" between the parties, not as applying narrowly to the type of business in which one party was supposedly involved. Hays & Co. v. Merrill Lynch, 885 F.2d 1149, 1153 (3d Cir. 1989). In Hays, the arbitration clause stated, in pertinent part, that "[i]t is agreed that any controversy between us arising out of your business or this agreement shall be submitted to arbitration . . . ." Id. The Third Circuit found that "[t]hus, the Customer Agreement purports to compel arbitration over all controversies that arise out of **the business relationship** between [the parties]." Id. (emphasis added).[13] Furthermore, the Third

---

[13] Other courts have similarly held that arbitration clauses that apply to controversies arising out of or related to "your business" or "this agreement" are broad. See, e.g., Zink, 13 F.3d at 331-32 (10th Cir. 1993) (inclusion of language "arising out of your business or this agreement shall be submitted to arbitration" evidences intent to cover more than just those matters stated in contract) (citing Belke v. Merrill Lynch, 693 F.2d 1023, 1028 (11th Cir. 1982) (same)); Trott v. Paciolla, 748 F.Supp. 305, 308-309 (E.D.Pa. 1990) (compelling arbitration of dispute arising before brokerage customers signed account agreement, where agreement contained clause with "broad" and "sweeping" terms that required arbitration of "any controversy between us arising out of your business").

The Delaware Chancery Court went so far as to wonder whether there are any disputes that such language would not cover, even where, as here, the transaction at issue might not have involved the account that the customer had registered:

Circuit has held that "when phrases such as 'arising under' and 'arising out of' appear in arbitration provisions, they are normally given broad construction." Battaglia, 233 F.3d at 727.

The "factual underpinnings" of Wald's complaint evidence his belief, at the time that he signed the Customer Agreement, that he was hiring defendants to conduct a broad range of business. His current argument that he hired defendants solely with respect to his IRA account contrasts with the allegations of his complaint. In the complaint, he pleaded that he hired defendants as his "financial and investment advisors" and "registered representatives." (Id. at ¶¶ 67, 70, and 93.) He further pleaded that 1 Financial Securities and Ross "entered into a contract with Plaintiff Wald to provide investment services that were in Plaintiff Wald's best interests." (Id. at ¶ 98.) In other words, Wald's complaint reflects that he hired defendants to provide a broad range of financial and investment advice. The "factual underpinnings" of Wald's complaint therefore clearly arise out of and are related to the business relationship between the parties.

Wald next argues that defendants could not have been in the "business" of marketing Securion because FINRA did not license defendants to market a hedge fund. Whether defendants ought to have been engaging in this activity, however, is a merits determination that is not for the court to decide for purposes of the current motion. See AT&T Tech., Inc., 475 U.S. at

---

It is true that plaintiff's grievance does not directly involve the maintenance of a margin account, which is but one aspect of the broker-customer relationship. The agreement, however, is all encompassing and does not seek to limit its scope to margin transactions. It is difficult to envision any transaction which would not be covered by the language: "any controversy between us arising out of [Merrill Lynch's] business or this agreement." Although the question is not free of doubt, such doubts must be resolved in favor of arbitrability where the arbitration agreement seeks to embrace a general relationship.

Leason v. Merrill Lynch, Pierce, Fenner & Smith, No. 6914, 1984 WL 8232, at *3 (Del. Ch. Aug. 23, 1984).

649-50.  Wald's argument does not ask the court to determine what the parties believed, at the time that Wald signed the Customer Agreement, that defendants' "business" would be.  Rather, Wald's argument asks the court to determine whether it was legally appropriate for defendants to market Securion to Wald at the time that they did so.  In Prtizker, the Third Circuit held that when an arbitration clause is broad, like the one here, an issue concerning whether a defendant acted within the scope of its authority must be arbitrated because it relates to whether the defendant breached the agreement.  7 F.3d at 1115.  The contention that the arbitration clause does not apply "because the defendants allegedly acted outside the scope of their authority under the agreement flatly contradicts the inclusive language contained in the clauses in question."  Id.  Similarly, given the broad scope of the arbitration clause at issue here, Wald's claims that defendants acted outside of the scope of their authority must be arbitrated.  "[I]ndeed one is left to ponder what purpose an arbitration clause would serve if it did not encompass claims that the terms of the parties' agreement had been breached."  Id.

Wald further argues that defendants were not in the business of marketing Securion because only the general partner of Securion, 1 Financial Marketplace – a separate entity from defendants – had the authority to receive management fees from the security.  It is apparent, however, that 1 Financial Marketplace is an entity related to defendants.  Wald has alleged that Ross controls both 1 Financial Securities and 1 Financial Marketplace. (Compl. ¶ 8; Pl.'s Ans. ¶ 7.)  The Customer Agreement discloses that 1 Financial Marketplace, along with 1 Financial Securities and 1 Financial Marketplace Holding Company, LLC, may be involved in a customer's investments.  (Defs.' Mem. Ex. A.)  Accordingly, even if defendants did not directly benefit from the management of Securion, defendants appear to have benefitted indirectly.  Given the broad business relationship that the Customer Agreement contemplates, Wald's

argument that defendants did not directly receive a management fee for Securion does not provide the "positive assurance" of non-arbitrability necessary to overcome the strong presumption in favor or arbitration. AT&T Techs., 475 U.S. at 650; Battaglia, 233 F.3d at 727.[14]

In support of his argument, Wald cites, Vertical Resources Inc. v. Bramlett, 837 A.2d 1193 (Pa.Super. 2003). Vertical Resources is inapposite because the court did not actually rule on the issue of arbitrability. The Pennsylvania Superior Court declined to find that the trial court abused its discretion in deciding that the dispute was not within the scope of an arbitration agreement, but declined to do so only because the entire agreement was not a part of the appellate record. Id. at 1203. Without the entire agreement, the court found that the issue was not properly before the court to examine. Id.

Accordingly, I find that the claims in the instant dispute are within the scope of the arbitration clause because they arise out of, and are related to, defendants' "business."

### 2. Wald's Claims Arise Out Of And Are Related To The Customer Agreement

Wald's claims also fall within the scope of the second prong of the arbitration clause: controversies "arising out of or relating to . . . this agreement." As noted above, the Third Circuit has interpreted a similar arbitration clause as applying broadly to the "business relationship" between the parties, not as applying narrowly to the type of business to which one party was supposedly involved. Hays, 885 F.2d at 1153. Furthermore, the Third Circuit has held that "when phrases such as 'arising under' and 'arising out of' appear in arbitration provisions, they are normally given broad construction." Battaglia, 233 F.3d at 727.

---

[14] Whether 1 Financial Securities or Ross as an agent for 1 Financial Securities had anything to do with the Securion transaction relates to the merits of plaintiff's claims, which must be decided by the arbitrator.

The "factual underpinnings" of Wald's complaint clearly arise out of and are related to "the agreement" between Wald, Ross, and 1 Financial Securities.  The Customer Agreement provides terms concerning the responsibilities of the parties, including that Wald understood that he was to read and understand the terms of a private placement memorandum regarding a security before placing any purchase order for it.  (Defs.' Mem. Ex. A.)  Wald alleges that defendants prepared and delivered to him a private placement memorandum regarding Securion.  (Compl. ¶¶ 16-17, and 87.)  Wald alleges, however, that defendants deceived him into investing in Securion and that he was too unsophisticated to be responsible for the loss of his investment.  (Id. at ¶¶ 18, 24, 26-37, 43, 45, 47, 49, and 51.)  In light of the Third Circuit's holdings that (1) language similar to that used in the instant arbitration clause should be read broadly as relating to the "business relationship" between the parties and (2) the phrase "arising out of," when used in a similar arbitration clause, should be given broad construction, the court cannot say with the positive assurance required of it by the Third Circuit that Wald's claims do not fall within the scope of his agreement to arbitrate.  Hays, 885 F.2d at 1153; Battaglia, 233 F.3d at 727.

**IV.    Conclusion**

For the foregoing reasons, I find that there is a valid arbitration agreement between Wald and defendants and that the instant dispute is within the scope of that agreement.  I will therefore grant defendants' motion to compel arbitration and stay the proceedings in this court pending completion of that arbitration.  An appropriate order follows.